# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JASON BROWNING,**

    **Plaintiff,**

v.                                            **Civil Action No. 1:16cv145**

**KAREN PSZCZOLKOWSKI, Warden;**
**JIM RUBENSTEIN, Commissioner;**
**WILLIAM YURCINA, Deputy Warden;**
**RYAN ADANS, Unit Manager/Director of**
**Classification; BRANDY MILLER, A.W.P.;**
**JOANIE HILL, A.W.O.; MIKE TAYLOR,**
**Chaplain; C.J. RIDER, Religious Services;**
**DALE GRIFFITH, Unit Manager; DAVE**
**ELLIOTT, Job Coordinator,**

    **Defendants.**

## **MEMORANDUM OPINION AND ORDER**

### **I. RELEVANT FACTS AND PROCEDURAL HISTORY**

On June 30, 2016, Jason Browning, the *pro se* Plaintiff, initiated this civil action by filing a complaint pursuant to 42 U.S.C. § 1983. The Plaintiff is a state prisoner who has had extensive disputes with the West Virginia Division of Corrections stemming from his religious beliefs as an Orthodox Jew.

The Plaintiff first filed suit on February 11, 2013, in Civil Action No. 1:13-cv-23 ("Browning I"). In that complaint, the Plaintiff alleged that various state correctional officials had violated his First Amendment right of free exercise of religion and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by: (1) denying him a kosher diet; (2) denying his religious apparel; and (3) denying him the right to worship

1

weekly or on special holidays. On March 20, 2015, the Court entered an Order which granted in part and denied in part a Motion for Summary Judgment filed on behalf of the individuals named as the Defendants. On February 6, 2016, after three rounds of mediation, a Settlement and Release of All Claims Agreement ("Settlement Agreement") was executed by the Plaintiff and the West Virginia Division of Corrections ("WVDOC"). This Settlement Agreement fully resolved any and all claims asserted by the Plaintiff, and accordingly, on February 12, 2016, the Honorable John Preston Bailey, United States District Judge, entered an order dismissing the case and retiring it from the active docket of the Court, subject to reopening on the motion of any party, and for good cause shown, within 90 days.

On June 30, 2016, the Plaintiff filed two separate motions in Browning I. First, he filed a Motion to Vacate Agreement. Second, he filed a Motion for an Injunction to enforce the Settlement Agreement. On December 14, 2016, the undersigned entered a Report and Recommendation that recommended that the motions be denied without prejudice. No objections were filed, and on January 17, 2017, the Court adopted the Report and Recommendations and denied both motions without prejudice.

As previously noted, the Plaintiff's instant complaint ("Browning II) was filed on June 30, 2016, the same date that he filed the above noted motions in Browning I. Although the complaint in Browning II is sparse at best, a review of the attachments suggested that the Plaintiff again alleged various violations of his Constitutional rights and RLUIPA. However, those claims appeared to be secondary to his main contention, that being that the WVDOC, who was not named as a Defendant, had breached the Settlement Agreement.

On December 23, 2016, an Order to Answer was entered, and summonses were issued for the Defendants. On January 25, 2017, the Defendants filed a Motion to Dismiss with a Memorandum in Support. On January 26, 2017, a Notice of Magistrate availability to exercise Jurisdiction (AO85) pursuant to LR PL P 28 was sent to the Plaintiff and Kenneth Hopper, counsel for the Defendants. On February 1, 2017, a Roseboro Notice was issued. On February 2, 2017, a Motion for referral based upon all parties consent to exercise of jurisdiction by a Magistrate Judge was filed. On February 7, 2017, an Order of Referral was entered granting the Motion to Refer the Case to the undersigned for all further proceedings. On February 25, 2017, the Plaintiff filed a response to the Motion to Dismiss, and on February 21, 2017, the Defendants filed a Reply.

On May 1, 2017, the Plaintiff filed a Motion to Amend. Although the Defendants filed an objection, the undersigned granted the Motion to Amend on May 12, 2017. On May 16, 2017, an Amended Order was entered. In the Amended Order, the Plaintiff was specifically advised that he must include in his Amended Complaint all of his claims and further advised him that the Amended Complaint would supersede his previous complaint and would be the only complaint given review.

On May 24, 2017, the Plaintiff filed his amended complaint. On June 13, 2017, the Defendants filed a Motion to Dismiss and/or Motion for Summary Judgment. A Roseboro Notice was issued on June 19, 2017. Following the grant of an extension of time, the Plaintiff filed an "answer." On September 5, 2017, the Defendants filed a Reply.

## II. CONTENTIONS OF THE PARTIES

### A. THE AMENDED COMPLAINT

Like his original complaint, the Plaintiff's Amended Complaint is sparse. The Plaintiff raises four claims:

1. The DOC and Defendants denied him the right to celebrate Passover two years in a row after agreement that he could have time and space for all Jewish holidays.

2. All Defendants and WVDOC are denying him a religious diet cooked separately from mainline with all foods cooked with the same stoves, pots and utensils.

3. Despite the WVDOC and the Defendants' agreement to allow him to take religious correspondence courses from the Aleph Institute, they refused to allow him access to the internet.

4. The Defendants and the WVDOC are stopping him from ordering bread and dairy products and most of the other items they agreed to in the agreement.

5. The Defendants and the WVDOC are refusing to allow Aleph to send him grape juice and matoza[1] every Sabbath and [tefillin][2] so that he can "don tefillin" each morning.

For relief, the Plaintiff seeks an order that: (1) the WVDOC change their policy so he can observe his holidays like Orthodox Jews; (2) the WVDOC provide a "kosher diet," (3) the

---

[1] The Court is unclear what matoza is. However, it appears that the Plaintiff may be referring to an unleavened bread that is part of Jewish cuisine and forms an integral element of the Passover festival. Several spellings can be found, including "matzah," "matza" and "matzo."

[2] Tefillin are two small black boxes with black straps attached to them. Jewish men are required to place one box on their head and tie the other on their arm each weekday morning. See http://www.jewishvirtuallibrary.org/jsource/Judaism/tefillin.html

WVDOC allow Aleph to send matzo, grape juice and tefillin to him; (4) the WVDOC provide a microwave to stay kosher; and (5) the WVDOC allow him to order monthly food packages; and (6) the WVDOC allow the Plaintiff to order four bowls, two cups and a 48 oz. container for grape juice and a king size cooler to keep food.

A. **DEFENDANTS' MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT**

In support of their alternation motions, the Defendants contend that :

1. The WVDOC has complied with the terms of the Settlement Agreement, and therefore, the Plaintiff's breach of contract fails as a matter of law;
2. The Eleventh Amendment precludes suit against the state and its agencies in federal court;
3. The legal doctrine of *res judicata* precludes the Plaintiff's claims against the Defendants; and
4. The Plaintiff has failed to exhaust administrative grievances.

B. **PLAINTIFF'S RESPONSE**

In his response, the Plaintiff does little to rebut the Defendants' Motion. In particular, he fails to address the Defendants assertion that he has not exhausted his administrative remedies. Instead, he emphasizes that he has to pay for the Passover feast for all the inmates who sign up for that feast. He reiterates this allegation by noting that he has to share his feast in order to have his Passover, and he is the only one who has to pay. He also appears to allege that he never celebrates Passover in the chapel and must always use another room. In addition, he mentions for the first time, that the exam discussed by the Defendants was a religious course that does not require a

proctor. Finally, he notes that he cannot get a sukkot[3] or a rams horn and free grape juice and mataz

**DEFENDANT'S REPLY**

The Defendants note that the Plaintiff's response fails to address the legal arguments contained in their Motion. More specifically, they note that the Plaintiff did not argue against Eleventh Amendment immunity, the application of the legal doctrine of *res judicata*, or his failure to exhaust administrative remedies. Moreover, they note that the Plaintiff does not discuss his main allegations that the WVDOC and the Defendants breached the Settlement Agreement. They then address each concern raised by the Plaintiff and argue that none establishes a breach of the Settlement Agreement.

### III. STANDARD OF REVIEW

**A. Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. Revene v. Charles County Comm'rs., 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic

---

[3] Sukkot is a seven day holiday sometimes referred to as the Season of our Rejoicing. In honor of the holiday's historical significance, Jews "are commanded" to dwell in a temporary shelter called a sukkah. The commandment to "dwell" in a sukkah can be fulfilled by simply eating all one's meals there. A sukkah must have at least three walls covered with a material that will not blow away in the wind. See http://www.jewishvirtuallibrary,org.

Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id.; see also Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8 (providing general rules of pleading), Fed. R. Civ. P. 9 (providing rules for pleading special matters), Fed. R. Civ. P. 10 (specifying pleading form), Fed. R. Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed. R. Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted). See Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-1 (1972) (per curiam); Erikson v. Pardus, 551 U.S. 89, 94 (2007); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th

Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985). Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30 (1st Cir. 2001)(cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462 (4th Cir. 2011).

**B. Motion for Summary Judgment**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for

8

summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

## IV.   ANALYSIS

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as

provided in § 1997(e)(a) is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[4] and is required even when the relief sought is not available. Booth v. Churner, 532 U.S. 731, 741 (2001). Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 126 S.Ct. 2378, 2382 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion." Woodford, 126 S.Ct. at 2387 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 2393.

In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint. Here, the Defendants have raised the affirmative defense and argued that dismissal for failure to exhaust is warranted.

The WVDOC has established a three level grievance process for prisoners to grieve their complaints in an attempt to resolve the prisoners' issues. The first level

---

[4] Porter v. Nussle, 534 U.S. 516, 524 (2002).

involves filing a G-1 Grievance Form with the Unit Supervisor. If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator. Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

In his amended complaint, with respect to grievances, the Plaintiff indicated that a grievance procedure is available at the Northern Correctional Facility, where he was incarcerated when he filed this action, and where he remains incarcerated. In addition, he indicated that he filed a grievance concerning the facts related to this complaint. He then noted: "the Plaintiff did file grievances which led to a settlement agreement which led Plaintiff to file a new civil suit for breach of contact." ECF No. 38 at 5-6. Therefore, it appears that the Plaintiff believes that he need not exhaust administrative grievances with respect to any alleged breach of the Settlement Agreement. However, he is incorrect in this regard.

The Settlement Agreement, dated February 12, 2016, specifically addresses the need to file grievances in order to enforce the agreement:

a. The WVDOC shall comply with this Agreement and shall inform the appropriate personnel of the Agreement so they may assist Jason Browning in providing the relief as required by this Agreement.

b. In the event the conditions and terms as contained in this Agreement are not met by WVDOC at any time, Jason Browning and WVDOC shall adhere to the following procedure: 1) Jason Browning shall first comply with any order and/or directive provided by an employee of the WVDOC even if said order

11

in contravention of this Agreement; 2) Jason Browning will then inform the employee and the unit manager of this Agreement; 3) Jason Browning will then show the employee and the unit manager his Agreement and the provision he believes is being violated. WVDOC shall initially provide Jason Browning with six (6) copies of this Agreement; prison officials at each WVDOC facility in which Jason Browning is confined shall have on file a copy of this Agreement. After consulting with the necessary supervisors including the chaplain, WVDOC will immediately provide Jason Browning with the requested relief consistent with this Agreement.

    i.    **Jason Browning shall utilize the grievance procedure in order to obtain relief desired. Usage of said process will ensure documentation of events and will assist in assessing the same.**

ECF No. 1-7 at 10 (emphasis added).

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements . . . ," see Booth v. Churner, 532 U.S. at 741, n. 6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Ziemba v. Wezner, 366 F.3d 161 (2d Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render the grievance procedure unavailable); Aceves v. Swanson, 75 Fed.Appx. 295, 296 (5th

Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Dotson v. Allen, 2006 WL 2945967 (S.D.Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where Plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms). Here, the Plaintiff has failed to set forth any acceptable reason to excuse his failure to exhaust. Accordingly, this complaint, as it relates to the Plaintiff's allegations regarding (1) denial of his right to celebrate Passover; (2) denial of his right to take correspondence courses; (3) denial of his right to order bread and dairy products; and (4) refusal to allow the Aleph Institute to send in grape juice, matza, and tiffilin is subject to dismissal for failure to exhaust administrative grievances.

There is one issue raised in the complaint, which was not addressed in the Settlement Agreement; Plaintiff's allegation that he is being denied a religious (kosher) diet. The Defendants have not addressed this issue in depth, and in particular, have not addressed the issue as it specifically relates to the Northern Correctional Facility. However, in Browning I, this issue was addressed in detail in the Report and Recommendation dated February 12, 2015, and the Court finds it appropriate to recite that discussion herein.

On May 1, 2014, Policy Number 511.00 was issued by the WVDOC. The subject of the Policy is "Religious Special Diet." Pursuant to this Policy, only one religious special diet will be created or served, and meat is never an item in the religious special

diet. Moreover, the policy acknowledges that the religious special diet is not intended to provide everything an inmate of any faith can eat. However, it is intended to provide a nutritionally adequate meal that meets dietary restrictions imposed by various beliefs. Of significance to Plaintiff, the Policy defines koshered as follows: "to make proper or ritually pure. In order to prepare meals, and any counter or surface the food comes in contact with must be koshered or the food will be rendered (TREIF) or no longer kosher. In order to render kitchen utensils and/or cooking surfaces koshered, the item used must be submerged completely in a vessel that contains boiling water." ECF No. 1-2 at 8-12. The Policy further provides that:

**FOOD ITEMS**

1. The entree for the Religious Special Diet may be purchased from a recognized vendor with appropriate Kosher and/or Halal[5] certifications. The Food Service Vendor will maintain current certifications. The product label for the entree shall display the appropriate certification symbol(s). Copies of all current certifications shall be maintained in the Food Service Area and in Administration offices.

2. Cereal used in the religious special diet program may be purchased in bulk. The packaging shall display the appropriate certification symbol(s).

3. The breads used in the religious special diets and used at each meal shall display the appropriate certification symbol(s). The required number of slices (portion) is to be taken from the original packaging and placed on the appropriately colored tray during serving as needed.

---

[5] "In Arabic, the word *halal* means permitted or lawful. Halal foods are foods that are allowed under Islamic dietary guidelines." http://www.mideastfood.about.com.
.

4. Fresh whole fruit and vegetables are to be broken when necessary to accomplish the proper serving size. Knives are not used in order to avoid treif contamination or violation of proper kosher food preparation.
5. Peanut butter, cream cheese, jelly, juice and other items used daily shall display the appropriate certification symbol(s). It is recommended, where economically feasible, to purchase products individually packaged which display the appropriate certification symbol(s).
6. The serving trays, bowls, eating utensils, etc., are to be color coded for the Religious Special Diet. A sufficient quantity of paper/Styrofoam products and individually wrapped spoons and forks should be maintained on hand for use during a lockdown, natural disaster, or other planned or unplanned event.
7. Specific handling requirement shall be addressed by the Food Service Vendor. The Food Service Vendor will train appropriate staff and inmate food service workers in proper Kosher Food Handling procedures. Current signed training forms on the handling requirements will be maintained on site by the vendor with a copy of the signed form going to the Warden/Administrator/Designee.
8. The food handling instructions for the religious special diet will be prominently displayed in the religious special diet preparation area(s).
9. Food stuffs and preparation and serving a utensils/equipment shall be appropriately stored in specifically designated areas.

**EQUIPMENT**

1. The purpose of providing and using separate cooking, serving, and eating utensils is to avoid cross contamination of foods. These items are to be used only for the religious special diet without exception.
2. Each item is to be distinctively and permanently marked for use with the religious special diet only.
3. Equipment for the religious special diet is to be stored separately in the respective locker box, secure cabinet, or other specifically designated secure location. Food Service Staff and/or Correctional Staff are the only ones authorized to retrieve from or place items in these secure areas.
4. The Food Service Contractor shall provide a required equipment list needed to prepare and serve the Religious Special Diet.
5. When necessary, the WVDOC will request the services of a Rabbi to perform the ritual cleansing/sanctifying ceremony (Kashering ceremony) for the designated utensils.
6. Replacement utensils and items improperly used will be ritually cleansed sanctified as well.

It would appear that this Policy Directive, if followed, insures that food prepared in the kitchens at WVDOC facilities is prepared according to kosher standards. During the pendency of Browning I, the Plaintiff was transferred to Huttonsville Correctional Center, which is wholly operated by the WVDOC. However, the terms of the Settlement Agreement provides that the WVDOC shall incarcerate the Plaintiff at either the Northern Correctional Center ("NCC") in Moundsville, West Virginia or Stevens (Welsh)

Correctional Center in Welch, West Virginia so as to allow him to follow his religious beliefs and to promote adherence to the Agreement. ECF No. 1-2 at 26.[6]

The Plaintiff is currently housed at the NCC, which is unique in that it is housed within the Northern Regional Jail ("NRJ"). The NRJ is a component of the West Virginia Regional Jail and Correctional Facility Authority ("WVRJA) , while the NCC is a component of the WVDOC. 1:13cv23, ECF No. 104-1, p.2. The kitchen at this "joint" facility was operated through a contract between the WVRJA and Trinity Services Group. Prior to March 31, 2014, the contract was between the WVRJA and Aramark. Consequently, unless circumstances have changed since Browning I, the WVDOC is not part of the food service contract which dictates the food provision and preparation at the NCC. Moreover, unless circumstances have changed since Browning I, because the NCF is housed at the NRJ, the policies and procedures of the WVRJA govern the operation of the kitchen and the means and methods by which food is prepared for inmates of the WVDOC. 1:13cv23, ECF No. 104-1, pp. 2-3.

When Browning I was pending, the kitchen at the NRJ prepared food for approximately 1000 inmates three times a day. 1:13cv23, ECF. No. 104-1, p. 2. Clearly, the preparation of an individual kosher meal and utilization of different cooking utensils would have interfered with the batch processing of these 3000 daily meals. Moreover, if Plaintiff were provided a kosher diet, the NRJ kitchen would have to prepare religious specific meals for every different religion to avoid any perceived favoritism. Again, such action would have interfered with the batch processing of the 3000 daily meals.

---

[6] The Agreement also provides that the designation to these two institutions is subject to exceptions which need not be detailed for purposes of this opinion.

Moreover, there would have been added expense to provide the appropriate storage of the food and utensils needed to prepare kosher meals.

From November 19, 2008, to March 21, 2011, Plaintiff received a "no pork" diet. 1:13cv23, ECF. No. 104-1, p.4. On March 21, 2011, Plaintiff switched to a "no flesh" diet. (*Id.*). The "no pork" diet was the same diet received by Jewish and Muslim inmates who requested the same. (*Id.*). The "no flesh" diet was the same diet received by Jewish, Hare Krishna, Buddhist, Hindu, and Seventh-Day Adventist inmates who requested said diet.(*Id.*). Accordingly, the meal Plaintiff received was neutral in religious requirements.

When Browning I was decided, the Court accepted that the Plaintiff's inability to receive a kosher meal from the kitchen at the NRJ/NCC placed a substantial burden on the exercise of his religion. However, the difficulties that would have ensued in providing a kosher meal to at most two inmates[7], including additional costs, interference with preparation of batch meals and creation of perceived favoritism between religious groups, are legitimate compelling interests that override the burden placed on Plaintiff's ability to receive an institutionally prepared kosher meal. Accordingly, the Court found that the Plaintiff failed to establish a RLUIPA violation with respect to kosher meals at the NCC. Assuming circumstances remain the same at the NCC, the Court would continue this opinion. To the extent that the WVDOC now controls food preparation at the NCC, or the WVRJA has adopted a similar policy for religious meals, the Plaintiff's current allegations regarding lack of kosher meal preparation may state a claim under

---

[7] At the time Browning I was pending, there was only one other Jewish inmate at the NCC. 1:13cv23, ECF No. 104-1 at 7.

RLUIPA. However, because the Plaintiff has not exhausted his administrative remedies regarding this allegation, the Court will not address this claim further.

In summary, the Court notes that there is a Settlement Agreement in place which addresses all but one of the allegations raised by the Plaintiff. The terms of that Settlement Agreement specifically require the Plaintiff to utilize the grievance procedures to obtain relief in the event that the conditions and terms of the Agreement are not met. The Plaintiff has not utilized the grievance procedure with respect to his allegations in the amended complaint. Therefore, he is precluded from pursuing his complaint alleging a breach of contract. In addition, to the extent that the Plaintiff is raising a claim under RLUIPA with respect to the preparation of kosher meals at the NCC, he likewise has failed to exhaust his administrative grievances as required by the PLRA. Because the Court finds that this matter is precluded by the Plaintiff's failure to exhaust grievances, the Court declines to address the Defendants' alternative theories of *res judicata* and Eleventh Amendment immunity.

## V. CONCLUSION

For the reasons stated herein, it is hereby **ORDERED** that the Defendants; Motion to Dismiss and/or Motion for Summary Judgment [ECF No. 39] be **GRANTED**, and the Plaintiff's Amended Complaint [ECF No. 38] be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative grievances.

**IT IS SO ORDERED.**

The Clerk of nCourt is **DIRECTED** to provide a copy of this Memorandum Opinion and Order to the Plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet and to all counsel of record via electronic means.

ENTER: March 26, 2018

*/s, James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE